**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF PENNSYLVANIA**

**ANDRA THOMAS,**                        :
 **o/b/o D.D.T.**
                                                    :
    **Plaintiff**                              **CIVIL ACTION NO. 3:13-0019**
                                                    :
        **v.**
                                                    :          **(JUDGE MANNION)**
**CAROLYN W. COLVIN,[1]**
**Acting Commissioner of the**          :
**Social Security Administration**
                                                    :
    **Defendant**
                                                    :

**M E M O R A N D U M**

The record in this action, (Doc. No. 10),  has been reviewed pursuant

to 42 U.S.C. §405(g) to determine whether there is substantial evidence to

support the Commissioner's decision denying the plaintiff's claim for

Supplemental Security Income ("SSI") under the Social Security Act ("Act").

42 U.S.C. §§401-433, 1381-1383f.

**I.    BACKGROUND**

Plaintiff Andra Thomas, on behalf of her minor son D.D.T., protectively

applied to the Social Security Administration ("SSA") for SSI under the Act on

October 13, 2010. (Tr. 19). Plaintiff seeks a closed period of disability from

_____

[1]On February 14, 2013, Carolyn Colvin became acting Commissioner
of the Social Security Administration. Pursuant to Fed.R.Civ.P. 25(d), she has
been substituted as the defendant.

October 13, 2010 through November 16, 2011. (Tr. 63).[2] Plaintiff requested

a hearing before an Administrative Law Judge ("ALJ"), which was held on

March 7, 2012 in Wilkes-Barre, Pennsylvania. (Tr. 47-91).[3] Plaintiff was

represented by counsel. (Id.). The ALJ heard testimony from the plaintiff and

from her minor son D.D.T. (Id.). On May 24, 2012 the ALJ determined that

D.D.T. was not disabled within the meaning of the Act. (Tr. 13-30).

Plaintiff requested review of the ALJ's decision by the Appeals Council.

(Tr. 11-12). On August 28, 2012, the Appeals Council denied the request for

review. (Tr. 1-5). Thus, the ALJ's decision became the final decision of the

Commissioner. 42 U.S.C. §405(g). Plaintiff filed the instant appeal of the

Commissioner's decision pursuant to 42 U.S.C. §1381 *et seq*. on January 4,

2013. (Doc. Nos. 1, 8). The parties have filed briefs in support of their

---

[2]Plaintiff's briefs contend that the plaintiff is not obligated to hold to this
"offer" to limit the disability period. Because the court only considers evidence
that was before the ALJ in doing its substantial evidence review, *see*
Matthews v. Apfel, 239 F.3d 589, 593 (3d Cir. 2001), plaintiff is, indeed, held
to her statement that she is seeking a closed period of disability. The ALJ
reasonably tailored his questioning and review of the record to conform with
the disability period stated by plaintiff. (Tr. 64). Moreover, the testimony at the
hearing does not indicate an "offer," but an affirmative statement of intent to
close the period - "we are seeking a closed period of disability." (Tr. 63).

[3]The transcript submitted in his case contains some new information
that was submitted to the Appeals Council, but that was not before the ALJ
at the March 2012 hearing. (Tr. 4, 223-30, 424-95). The court can not
consider that information in performing its substantial evidence review.
"Although evidence considered by the Appeals Council is part of the
administrative record on appeal, it cannot be considered by the District Court
in making its substantial evidence review..." Chandler v. Comm. of Social
Sec., 667 F.3d 356, 360 (3d Cir. 2001)(*quoting* Matthews, 239 F.3d at 593 ).

2

respective positions. (Doc. Nos. 13, 16, 19).

## II.    STANDARD OF REVIEW

When reviewing the denial of disability benefits, the court must determine whether the denial is supported by substantial evidence. Brown v. Bowen, 845 F.2d 1211, 1213 (3d Cir. 1988); Johnson v. Commissioner of Social Sec., 529 F.3d 198, 200 (3d Cir. 2008). Substantial evidence "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Pierce v. Underwood, 487 U.S. 552 (1988); Hartranft v. Apfel, 181 F.3d 358, 360. (3d Cir. 1999), Johnson, 529 F.3d at 200. It is less than a preponderance of the evidence but more than a mere scintilla. Richardson v. Perales, 402 U.S. 389, 401 (1971).

## III.   DISABILITY DETERMINATION PROCESS

To qualify for SSI benefits under the Act, a minor claimant must demonstrate that he is "disabled" within the meaning of 42 U.S.C. §1382c(a)(3)(C)(I), which provides that,

> "An individual under the age of 18 shall be considered disabled for the purposes of this subchapter if that individual has a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."

3

An examiner makes a three-step evaluation, found in 20 C.F.R. §§416.924, 416.926a, to determine whether a claimant under the age of 18 is disabled, and therefore entitled to SSI benefits. At step one, if the claimant is engaged in substantial gainful activity, he is not disabled. At step two, if the claimant is not engaged in substantial gainful activity, then the examiner will determine whether the physical or mental impairment is "severe." At step three, if the impairment is severe, the examiner will determine whether the impairment meets, medically equals, or functionally equals an impairment listing found in 20 C.F.R. §404, Subpart P, App. 1.

To determine whether an impairment functionally equals a listed impairment, the examiner considers how a minor functions in six domains: (1) acquiring and using information; (2) attending and completing tasks; (3) interacting and relating with others; (4) moving about and manipulating objects; (5) caring for himself, and; (6) health and physical well-being. 20 C.F.R. §416.926a(b)(1). An impairment functionally equals a listing level impairment if there are "marked" limitations in two of the six domains, or if there is an "extreme" limitation in one domain.   20 C.F.R. §416.926a(d). A "marked" limitation seriously interferes with a plaintiff's ability to independently initiate, sustain, or complete activities. 20 C.F.R. §416.926a(e)(2)(I). An "extreme" limitation is more than "marked" and very seriously interferes with a plaintiff's ability to independently initiate, sustain, or complete activities. 20 C.F.R. §416.926a(e)(3)(I).

4

## IV.    THE ALJ'S DECISION

The ALJ found that D.D.T. was a school-age child on the date of application for SSI, and that he is currently an adolescent. At step one, he found that D.D.T. has not engaged in substantial gainful activity since October 13, 2010, the alleged onset date. At step two, the ALJ found that D.D.T. has the severe impairment of attention-deficit hyperactivity disorder. At step 3, he found that claimant does not have an impairment that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. §404, Subpart P, App. 1. (Tr. 19). He also found that D.D.T. did not have an impairment or combination of impairments that functionally equals the severity of the listings. (Tr. 20). Specifically, he found that D.D.T. has "less than marked" limitations in acquiring and using information, attending and completing tasks, and health and physical well-being. (Tr. 23, 25, 29). He also found that D.D.T. has no limitations in interacting and relating with others, moving about and manipulating objects, and caring for himself. (Tr. 26, 27, 29). The ALJ ultimately found that D.D.T. had not been under a disability since the date of application. (Tr. 30).

## V.    EVIDENCE OF RECORD

Plaintiff has alleged disability since October 13, 2010. The evidence of record establishes that plaintiff was an eleven year old sixth grader at the time

5

of alleged disability onset. (Tr. 48). Notes from his primary care physician, Dr. Garry Hamilton, M.D., indicate that his parents first expressed concern about his behavioral problems on December  2, 2009, stating that although D.D.T. was maintaining good grades, he was hyperactive, having a hard time paying attention, and somewhat disruptive at school. (Tr. 243).

On December 22, 2009, after reviewing a parental diagnostic tool and discussing treatment goals with D.D.T.'s parents, Dr. Hamilton diagnosed plaintiff with attention deficit hyperactivity disorder ("ADHD") and prescribed a trial of Vyvanse and behavioral management by a psychologist. (Tr. 237). On May 20, 2010, Dr. Hamilton noted that D.D.T. was taking his medicine and was doing well in school. It was noted that his ADHD was mainly the inattentive type. (Tr 282-83). On October 6, 2010, Mary Jane Torres, M.D. noted that D.D.T.'s mother had concerns because she had received several calls about his behavior in school which indicated that he was not following instructions, needed to be redirected frequently, and was not paying attention or concentrating. (Tr. 285-86). D.D.T. had recently moved and changed schools, and his mother thought that the stress and changes were contributing to his behavior. His grades remained good, and a physical examination did not reveal anything unusual. D.D.T.'s Vyvanse dosage was increased, and his mother was advised to talk to D.D.T.'s teachers and discuss a plan for behavior modification due to ADD. There was no mention of hyperactivity on that date. (Id.).

On May 18, 2010, D.D.T. saw Dr. Moiz Mohyuddin, M.D., who completed a statement of his functional abilities. (Tr. 255-259). He noted that D.D.T. had a congenital defect in his left index finger and left thumb, that he had well-controlled asthma, and that he had been on ADD medication for a few weeks, appeared to be doing better, and needed continued monitoring. (Tr. 255). He found D.D.T.'s functioning to be "age appropriate" in each of the six relevant domains of functioning. (Tr. 256-59). He completed another evaluation on January 19, 2011, noting that the Vyvanse was "helpful," and repeating that D.D.T.'s functioning was "age appropriate." (Tr. 308-312).

On May 26, 2010, D.D.T. was evaluated by Tiffany Griffiths, Psy.D., at the Bureau of Disability Determination. (Tr. 262-70). She noted that his mother has bipolar disorder and other mental problems. She found his symptoms of being easily distracted and frequently feeling bored consistent with inattentive ADHD. (Tr. 266). She noted that he appeared alert and cooperative, was receiving instruction in advanced classes, and was "always bored." His mother noted his difficulty remaining on task at home and school. (Tr. 267). His mother indicated that he had a lot of friends, and was involved with the Cub Scouts and played basketball. Dr. Griffiths determined that D.D.T.'s "only difficulty" seemed to be that he was easily bored, likely because he was not challenged enough. (Tr. 268). She found that he had "no problems" in the six domains of functioning, except for attending and completing tasks, in which domain she noted his being easily bored. (Tr. 262-

7

65).

A July 15, 2010 childhood disability evaluation by Social Security Administration consultants Theodore Waldron and John Chiampi, Ph.D. found that D.D.T.'s ADHD was an impairment, but not one severe enough to meet or equal the listings of the C.F.R. They found his functioning to be age appropriate in all six domains. (Tr. 271-76).

At a November 2, 2010 psychological evaluation by Anthony L. Drago, Ed.D., D.D.T.'s parents noted several concerns about D.D.T.'s behavior, including lack of organization, being easily distracted, forgetfulness, tendency to interrupt others, being easily annoyed by others, and tendency to internalize his anger. (Tr. 305). His peer relationships were described as positive. He appeared anxious, especially when discussion centered on his behavioral troubles. (Tr. 306). His responses to questions were under-developed, and his social judgment immature. (Tr. 306-07). He occasionally would not hand in assignments unless they were perfect. (Tr. 306). Dr. Drago recommended that D.D.T. see a behavioral specialist 12 hours per month to help with attention, organizational skills, anxiety management, and to help the family with behavior management. (Tr. 307). On February 4, 2011, Dr. Drago reported than plaintiff was making progress, albeit slowly. (Tr. 331). On November 17, 2011, he noted that D.D.T.'s progress was good and that the number of hours for his behavioral specialist could be reduced. (Tr. 327).

On February 18, 2011, Dr. Feror Sheikh, M.D., and Paul A. Perch,

Ed.D., Social Security Administration consultants, completed a child disability evaluation on D.D.T. (Tr. 319-324). They determined that D.D.T. had less than marked limitations in acquiring and using information, attending and completing tasks, and health and physical well-being. They also determined that he had no limitations in interacting and relating with others, moving about and manipulating objects, and caring for himself. (Tr. 320-22). They found that D.D.T. had severe impairments, but that they did not meet, medically equal, or functionally equal the listings. (Tr. 319).

D.D.T. had psychological evaluations, personality assessments, and treatment plans at Northwestern Human Services ("NHS") every 120 days from November 2, 2010 through January 23, 2012. (Tr. 325-382). The notes from his first meeting on November 2, 2010, reflect that D.D.T. is bright, with a winning personality. However, he alternates between being a perfectionist or extremely careless, and can "act out" "impulsively and immaturely." Paul Seybold, M.S., D.D.T.'s NHS clinician, created goals of helping D.D.T. become better organized, attend to the requests of adults in his life, and become less anxious so that his functioning is not impaired. Various methods of obtaining these goals were discussed with D.D.T. and his parents, including maintaining consistent communication between D.D.T. and his parents, D.D.T. taking responsibility for both his accomplishments and negative behaviors, and D.D.T.'s parents learning how to define his negative behaviors and evaluate their reactions to them. (Tr. 375-82).

The NHS notes from February 4, 2011, do not contain any progress notes on D.D.T.'s treatment plan. (Tr. 367). On May 23, 2011, the evaluation notes of Dr. Sheila Barber, Ph.D., reflect that D.D.T's stepfather left the home he was sharing with D.D.T. and his mother after a violent altercation. (Tr. 334). Mr. Seybold's treatment plan of the same date reflects that the household had severe financial stress at the time, and they had recently moved. D.D.T.'s mother was herself having difficulty with the stressful situations and her mental illness. (Tr. 358).

Positive changes in D.D.T.'s behavior were noted, including being less defiant, taking his medicine properly, which resulted in better control of his ADHD at school, and being less aggressive when his requests were not immediately granted. He had become less of a perfectionist. He assisted his mother with arranging the move to a new home and was cooperative under the stressful home situation. It was noted that D.D.T. continued to resist showering and maintaining hygiene, and remained anxious and compulsive if his requests were not granted quickly. He remained disorganized in transporting work from home to school and back. Relaxation techniques, consistent enforcement of house rules, and creating established routines were recommended for treatment. (Tr. 357-66). Dr. Barber's evaluation was repeated in the NHS notes from September 19, 2011, and D.D.T.'s treatment plan was renewed.

Dr. Hamilton's notes from December 21, 2010 indicate that he had "no

concerns" about plaintiff's developmental assessment, and that plaintiff was doing better in school, taking Vyvanse and "doing well" on it, and seeing a behavioral specialist. (Tr. 422). At a physical on August 19, 2011 Dr. Mohammad Hossain, M.D., reported that D.D.T. was off of his Vyvanse for 2-3 weeks. His mother reported that he was "doing fine." (Tr. 415).

A function report completed by D.D.T.'s mother on April 4, 2010 indicates that his impairments did not affect his behavior with other people or hinder his progress in learning. (Tr. 141, 143). She noted that he did not respond to criticism, do what he was told, help around the house, or independently take care of his hygiene. She also noted that his attention had improved with medication, although he still had problems completing tasks and becoming easily frustrated, needing consistent reassurances. (Tr. 137-147). She completed another function report on October 23, 2010, in which she indicated that D.D.T.'s ability to progress in learning was limited, although she did indicate any specific areas where he was deficient in learning. (Tr. 170). She indicated that his impairments did not affect his ability to take care of his personal needs. (Tr. 173). She also noted continued problems with completing tasks that he started, including homework and chores. (Tr. 174).

A teacher questionnaire regarding D.D.T.'s functioning in the six domains completed by D.D.T.'s fifth grade communications arts, science, and

social studies teacher on April 7, 2010 indicated that D.D.T. had problems[4] in the domain of acquiring and using information, specifically "obvious" problems with comprehending oral instructions, participating in class discussions, and expressing ideas in writing. (Tr. 155). The teacher also determined that D.D.T. had problems with the domain of attending and completing tasks, specifically "obvious" problems with attention, focusing and refocusing, organization, distractability, and pace, and a "slight" problem with completing assignments. (Tr. 156). D.D.T. also had problems in the domain of caring for himself, with "obvious" difficulty with using coping skills to meet school demands and knowing when to ask for help. (Tr. 159).  The teacher found that D.D.T. had no problems in the other domains of functioning. (Tr. 157-58, 160).

Another teacher questionnaire completed by D.D.T.'s sixth grade science teacher on November 5, 2010 indicated problems with acquiring and using information, specifically "serious" problems with participating in class discussions, providing organized oral explanations, and applying problem-solving skills in class discussions, and 'slight" problems with comprehending instructions and expressing ideas in writing. She indicated that he hesitated a long while before answering a question, although he usually did or said the correct thing eventually. (Tr. 183). The teacher also indicated he had trouble

---

[4]The scale on the teacher questionnaires is: 1) No problem; 2) a slight problem; 3) an obvious problem; 4) a serious problem; 5) a very serious problem. (Tr. 155-62, 183-88).

in attending and completing tasks, specifically "obvious" problems with sustained focus and pace, and "slight" problems with refocusing, carrying out detailed instructions, and completing assignments. The teacher commented that "it takes [D.D.T.] a while to do most things." (Tr. 184). He had no problems in the other domains of functioning. (Tr. 185-88). The teacher commented that she did not know if D.D.T. had friends, that he was quiet and seemed to "zone out" sometimes, and that his facial expressions were described as "almost robotic." (Tr. 185, 187).

D.D.T.'s school records indicate in a letter dated November 4, 2011 that he did not qualify for special education services. (Tr. 204-06). In an evaluation by the Pocono Mountain School District, D.D.T.'s mother indicated that he likes video games, spending time with younger children and children his age, riding his bike, and climbing trees. She said he is a good reader and mathematical reasoner, lacks organizational skills, and needs to slow down when he speaks and be more academically challenged. (Tr. 210). The school psychologist noted that he does well academically, and articulates well, with a good vocabulary. She noted that he gets food all over himself when he eats, seems unaware of some social conventions, and is occasionally insensitive to the needs of others. (Tr. 210).

His teachers indicated that he generally does well academically, although he needs to be redirected in class and has poor organizational skills. (Tr. 210-11). During testing, he was fidgety, but easy to redirect. (Tr. 211). His

13

verbal and non-verbal reasoning was in the "high average" range, and his ability to sustain attention, concentrate, and exert mental control was in the "average" range, as was his speed for processing routine information. While weak compared to his reasoning skills, his mental control and processing speed were deemed comparable to that of his peers. (Tr. 213). His academic achievement test results were average or above average. (214-15). He scored in the low/not probable range for Asperger's Disorder. (Tr. 217). The school's behavior assessment of D.D.T. was based on his mother's rating of his behavior as well as testing scores. (Tr. 215). His difficulties with externalizing and internalizing problems and adaptive skills were noted. (Tr. 215-216). His difficulties varied in severity, and qualified him for a Section 504 service agreement for some accommodations within the regular classroom environment, although not for special education classes. (Tr. 217).

At the hearing before the ALJ, D.D.T. testified that he had recently made the honor roll at school, making As and Bs. (Tr. 50). He said that he was not getting in trouble at school "anymore." (Tr. 51). He noted wanting to sign up to play baseball, although he had not played organized team sports before. (Tr. 52-53). He did not remember how many times in the previous school year he had been told he was disturbing the class. (Tr. 53). He testified to having "about 10" friends who he sees outside of school, usually on weekends, with whom he plays video games and plays basketball. (Tr. 53-57). He testified that he sometimes forgot to do his homework and that he had

been reprimanded for not paying attention "most days" the previous school year, but that he was doing better and paying attention this year. (Tr. 58-60).

D.D.T.'s mother's testimony disagreed with D.D.T's about the number of friends he has, putting the number at four, with only one friend D.D.T. plays with consistently. (Tr. 65). She testified that in October of 2010, D.D.T. was in Cub Scouts and taking piano lessons. (Tr. 66). She said that teachers were calling her frequently about D.D.T.'s disorganization, forgetfulness, and unpreparedness at that time. (Tr. 67). He once got in trouble for carving his name into his hand with an unknown object, which D.D.T. represented to be an eraser. (Tr. 67-68). She noted that he had problems interacting with other children, having "a flat profile" towards them. (Tr. 69). She brought D.D.T.'s "agenda book" to the hearing, and stated that it showed all the times he had not completed his work on time and had failed to turn in assignments, even though she knew he had completed them. (Tr. 71-73). She also noted that at times, his perfectionism kept him from handing assignments in on time. (Tr. 73-74). She said he needs to be redirected by teachers "constantly." (Tr. 74). D.D.T. had a plan implemented at school which gave him more time for tests and assignments, and that she had to sign his agenda book nightly, which other parents did not have to do. (Tr. 76-79). The ALJ inspected the agenda book at the hearing. (Tr. 80-83).

15

## VI.    DISCUSSION

Plaintiff argues that the ALJ erred in failing to consider relevant evidence, including the reports of Dr. Drago, the personality assessment by Dr. Barber, the school's service plan which lays out D.D.T.'s accommodations, his school evaluation of October 26, 2011, and D.D.T.'s mother's testimony. Plaintiff next argues that the ALJ mischaracterized the November 2010 teacher questionnaire while improperly relying on the earlier April 2010 questionnaire. Finally, plaintiff argues that records submitted to the Appeals Council constitute new and material evidence which necessitates a remand to the ALJ.


A.    The ALJ Properly Considered the Evidence of Record

Plaintiff contends that the ALJ failed to consider or "rejected" much of the documentation of D.D.T.'s problems in functioning which are "probative of limitations" in several of the domains of functioning. The ALJ did find "less than marked" limitations in the domains of acquiring and using information, attending and completing tasks, and health and physical well-being. Plaintiff contends that these limitations are marked, and that the ALJ's failure to find a marked degree of limitation shows that he failed to consider or improperly considered the evidence of record.

Plaintiff contends that the ALJ did not properly consider the opinions of Dr. Drago, and that he did not sufficiently analyze them. The ALJ, however,

cites the exhibit in which Dr. Drago's opinion is contained no fewer than eleven times in his opinion. Moreover, the ALJ noted D.D.T. had a behavioral specialist, a treatment which Dr. Drago prescribed, and gave credence to Dr. Drago's assessment of D.D.T.'s difficulties in paying attention and needing assistance with organization in finding that D.D.T. had limitations in the domains of acquiring and using information and attending and completing tasks. The ALJ noted and gave weight to Dr. Drago's assessments of D.D.T.'s functioning. The ALJ's opinion does not suggest that he disregarded Dr. Drago's reports, but rather that he considered them properly in conjunction with the other evidence of record.

Plaintiff also argues that the ALJ did not properly consider the personality assessment made by Dr. Barber in May 2011. The exhibit in which Dr. Barber's assessment, and the treatment plan which relies on it, are mentioned by the ALJ eleven times throughout the opinion, and his opinion addresses the findings of the professionals at NHS in terms of D.D.T's problems and progress in dealing with those problems. Dr. Barber's findings reflect D.D.T.'s continued disorganization, resistance to taking care of his hygiene, and anxiety if his needs were not immediately met. (Tr. 334). These findings were credited by the ALJ's finding that D.D.T. had limitations in certain areas of functioning, and the ALJ specifically addressed Dr. Barber's assessment of D.D.T.'s functioning, including the score she gave him on the

Global Assessment of Functioning scale.[5] (Tr. 21). The ALJ properly considered Dr. Barber's opinion with the other evidence of record.

Plaintiff next contends that the ALJ improperly ignored the 504 Service Plan implemented to accommodate D.D.T. in school. The 504 plan is dated January 12, 2012, (Tr. 198-201), which is two months after the disability period ended on November 16, 2011. The ALJ thus need not have considered the 504 plan in making his disability determination.[6]

Plaintiff contends that the ALJ did not specifically mention the school evaluation report of October 26, 2011. However, the ALJ's opinion reflects that he took the school evaluation report into account in determining that D.D.T. has limitations in acquiring and using information and in attending and

---

[5]A GAF score, or a Global Assessment Functioning scale, takes into consideration psychological, social, and occupational functioning on a hypothetical continuum of mental health. American Psychiatric Association, Diagnostic & Statistical Manual of Mental Disorders 34 (4th ed. text revision 2000).

[6] However, the ALJ's decision indicates that he did, in fact, consider the 504 plan, and credited it for the propositions that D.D.T. had difficulty concentrating and was easily distracted and bored. (Tr. 23) D.D.T. received in-class accommodations such as extra time for completing assignments and "additional prompting" by his teachers. The 504 plan does state that D.D.T. receives "no accommodations" for participation in statewide/local assessments. (Tr. 201). The ALJ mistakenly stated that D.D.T. receives "no accommodation." (Tr. 23). This error is a minor one for two reasons. First, the 504 plan does not reveal that D.D.T.'s limitations qualified him for special education, or that they were severe, as the accommodations consist merely of allowing for additional prompting and extending extra time to complete assignments. Second, the 504 plan was completed outside of the relevant period of disability, and the error in interpreting it is not material to whether D.D.T. was disabled during the alleged disability period.

18

completing tasks. (Tr. 23, 25). He specifically notes that the teacher's reports in the evaluation reflect that D.D.T. had a hard time concentrating, had behavioral problems at school, and was easily distracted. He also noted the teachers' reports within the evaluation which reflect that D.D.T. was academically doing well in their classes. The ALJ clearly considered both aspects of the evaluation supported that D.D.T. had a disability, and aspects that showed the more positive evidence of his functioning. The ALJ credited the evaluation in determining that D.D.T. did, in fact, have limitations. The ALJ properly considered the school evaluation in conjunction with the other evidence of record.

Plaintiff next argues that the ALJ did not give sufficient credit to the testimony of D.D.T.'s mother. "The ALJ is empowered to evaluate the credibility of witnesses, and his findings on the credibility of claimants 'are to be accorded great weight and deference, particularly since an ALJ is charged with the duty of observing a witness's demeanor and credibility.'" Irelan v. Barnhart, 243 F.Supp. 2d 268, 284 (E.D. Pa. 2003)(*citing* Van Horn v. Schweiker, 717 F.2d 871, 873 (3d Cir.1983); Walters v. Comm'r of Soc. Sec., 127 F.3d 525, 531 (6th Cir.1997)). The ALJ did note that he found the testimony regarding the intensity and limiting effects of D.D.T.'s symptoms to be not credible because it was inconsistent with the rest of the evidence considered by the ALJ. (Tr. 21). Here, there was a large amount of medical and school-related evidence regarding D.D.T.'s behavior and limitations. The

ALJ was entitled to weigh D.D.T.'s mother's testimony with the rest of the evidence and make his own credibility determination.

Plaintiff finally contends that the ALJ improperly gave weight to a teacher evaluation completed in April 2010, before the disability period began, and that the ALJ mischaracterized the evidence in the November 2010 teacher evaluation. First, an ALJ *may* consider evidence outside the disability period that is probative. Townsend v. Sec. U.S. Dept. of Health and Human Serv., 2014 WL 128690, at \*2 (Jan. 15, 2014 3d Cir.). Even assuming for the sake of argument that the ALJ should not have considered the earlier report, to do so would have been minimal error because his determination that D.D.T's limitations were "less than marked" was also supported by copious medical and other evidence from within the relevant disability period.

Second, the ALJ did not mischaracterize the evidence of the November 2010 report. Plaintiff contends that the November teacher evaluation states that D.D.T. had "serious" problems in the domain of using and acquiring information, and that this necessarily means that D.D.T. had "marked" limitations in that domain, because a "marked" limitation is one which interferes "seriously" with the ability to complete activities. The ALJ was entitled to consider the teacher evaluation in conjunction with other evidence which supports that D.D.T.'s limitation in the domain was less than "marked." Even if the ALJ had given weight completely and solely to the November 2010 teacher evaluation, and had determined that the teacher's finding of a

20

"serious" problem necessarily meant that D.D.T. had a marked limitation in that domain, the evaluation only states that D.D.T. had "serious" problems in the domain of acquiring and using information. As a minor must have "marked" limitations in two or more domains of functioning to be found disabled, accepting the plaintiff's arguments would still not result in a finding of disability for D.D.T. during the relevant period.

Accordingly, the court finds that the ALJ's opinion regarding the severity of D.D.T.'s limitations is supported by substantial evidence.

B.    Records Submitted to the Appeals Council Do Not Require Remand

Pursuant to 42 U.S.C. §405(g), sentence six, this court may order a remand based upon evidence submitted after the ALJ's decision, but only if the evidence satisfies three prongs: (1) the evidence is new; (2) the evidence is material; and (3) there was good cause why it was not previously presented to the ALJ.

Here, plaintiff submitted records of acute partial hospitalization of D.D.T. for the period of May 17, 2012 through June 15, 2012. While this evidence is indeed new, and there is good cause why it was not provided to the ALJ, as the hospitalization occurred after the hearing before him, this new evidence is not material to the question of whether D.D.T. was disabled from October 2010 through November 2011, because it relates to a time frame after the alleged period of disability had closed. *See* Brown v. Colvin, 2013 WL

4594964, at *11 (D.Del. Aug. 27, 2013)(*citing* Szubak v. Sec. of Health and Human Serv., 745 F.2d 831, 833 (3d Cir. 1984)(materiality requires that new evidence relate to the time period for which benefits are sought)). If plaintiff believes that these records are evidence of disability existing outside of the disability period that is the subject of the instant appeal, then plaintiff may file an application for benefits for the new period.

## VII.   CONCLUSION

In light of the foregoing, the court finds that the ALJ's opinion is supported by substantial evidence, and that the new evidence supplied to the Appeals Council does not warrant remand. Thus, plaintiff's appeal of the decision of the Commissioner is **DENIED.** The Clerk is directed to close the case. A separate order shall issue.

s/ *Malachy E. Mannion*
**MALACHY E. MANNION**
**United States District Judge**

**Date: January 28, 2014**

O:\Mannion\shared\MEMORANDA - DJ\CIVIL MEMORANDA\2013 MEMORANDA\13-0019-01.wpd